Will you call the next case please? 3-12-235 Claypool Drainage and Webbing District Counseling by Charles Schmitt v. Charles O'Leary, Appellant by Daniel Callen. Mr. Callen. Thank you, Your Honor. May it please the Court, Mr. Schmitt. Good afternoon. I'm here for the Seco, um, the Seco people for their recreation club. The issue, obviously if you've read, I'm sure you've read over the material, is whether the drainage is north or south. The Claypool says it goes north, Seco says it goes, excuse me, Seco says it goes north, Claypool says it goes south. Judge Peterson, trial court judge, agreed with Claypool and entered a summary judgment. As you well know, the standards for review of a summary judgment are familiar with all of us. And that the trial court must find there's no genuine issue of material fact and that the summary judgment should only be granted when the issue is free from doubt. I'm suggesting that there is doubt as to which way the water flows, if it's north or south. And that's a question that is not free from doubt. It's not in the same category as the sun rises in the east, which is no doubt. The judge, the trial court judge, struck portions of the, um, cabus affidavit, the, um, as violation of discovery rules. And the rule, um, that the judge entered was that, um, all 213 expert witnesses, their opinions and reports, uh, shall be disclosed in 30 days. And likewise, rebuttal opinions should be disclosed 30 days after. Note that the order does not require, it's not a cutoff order, there's no cutoff date or closure of discovery in that order. The trial court, we're submitting to this court, abused its discretion, and that abuse of discretion, as I've said in my brief, is also subject to de novo ruling by this court, or de novo review, excuse me, by this court. The, um, cabus, Mr. Neville filed the affidavit for Claypool. Ms. Cabus filed the affidavit, the counter affidavit, I've labeled it as, in support of SECO. The cabus preliminary report is in the common law record, that was filed timely, the report was disclosed timely. Neville filed an affidavit in May 16, 2011. Claypool then filed a second motion for summary judgment in August, August 16, the discovery cutoff date was August 8, 2011. Now, SECO filed a response to the second motion for summary judgment on October 18, and in that response, they attached the cabus affidavit, which was a paragraph by paragraph rebuttal, if you will, of the Neville affidavit. It was basically what I've labeled it as, or characterized it as, as a counter affidavit. The court then struck a number of paragraphs, I've got them listed here, 15-3, 15-5, 15-6, 15-8, 15-13, for a violation of the discovery rules. That is what we are alleging is abuse of discretion. Now, Rule 219C requires, allows for, as we all know, for sanctions, violation of discovery orders. And the rule requires that the violations need to be, or should be unreasonable, or a finding of unreasonable, before sanctions apply. Now, we're alleging that, or arguing to this court, that the violations, if any, because I'm not conceding that the violations were violations, but if there were, that the, the, the sanction was unreasonable in this case of abuse of discretion. There's two reasons I'm alleging that to this court. One is that in their motion to strike the affidavits, or sections of the affidavit, SECO did not allege surprise. We didn't come up there and say, oh, you said black in your preliminary report, now you're saying white in your affidavit. I'm surprised. That did not happen. And secondly, there's no allegations anywhere in the record that the failure to abide by the discovery order was condemnations or a subject matter of contempt. There's no indication of that at all. What we have here is an affidavit that rebutts or addresses each of the points in the affidavit filed by Meville. The, so the sanctions I'm suggesting, or that I'm not suggesting, the law suggests, must be commensurate with the violation, and I'm suggesting to this panel that the sanctions are way beyond the pale in terms of what the violation is, especially in light of the fact that there's no, no surprise or contempt in this way. And I'm, I cited in my brief two cases, the Wheatie case and the Hanley case for the proposition. In the Wheatie case, I think what I'm suggesting is analogous in this situation. I've cited in my brief where the deposition testimony was attached to the motion for summary judgment, and a counter affidavit was, was put in there to highlight and emphasize the, as the witness was allowed to file a counter affidavit, it was expanded, clarified as deposition testimony. That's what I'm suggesting happened here, is that the counter affidavit clarified and expanded the previously filed preliminary report. So consequently, I'm suggesting that case supports our argument, and also the Hanley case supports our argument to the effect that the affidavit, the affiant, if you will, does not necessarily have to be able to testify at the trial. In the Hanley case, the witness was barred, but yet his affidavit was allowed in the motion for summary judgment, even though he was not going to be allowed to testify at trial, or he was barred at trial. So those are the cases I'm citing to support my argument. I'm suggesting that the violation was not a violation. It was, her affidavit was merely clarifying in light of the subsequent filed affidavit. I mean, it's not something new all of a sudden. It was directly responded to, the Neville affidavit, and all of the facts and circumstances, all of the data, if you will, and the drainage, whether it's north, south, east, or west, was all used by the same, the same facts and circumstances were used by both experts. You know, the GIS, the topography, all of the stuff was basically used by both experts, and I submit to you that that's why there wasn't a lot of surprise in this matter. That's the first part of what I'm contesting in Judge Peterson's ruling in this matter. And if there's any questions on that particular issue, I'm going to go on to the next thing. If I struck parts of the affidavit as being irrelevant, speculative, and conclusional, I'm suggesting to you that one of the things is that you didn't allege, you didn't state in your affidavit to a reasonable degree of certainty. I've cited cases in my brief that the magic words are not necessary. What is necessary is you have an expert or a witness that's capable of testifying with a specific area of knowledge, which we have here. There is no motions, no indication, no argument that either of these expert witnesses were not qualified. Both of them were, I submit, highly qualified water management experts. The affidavit is sufficient even though it doesn't have the magic words and even if it contains conclusions. The Kabbas and her affidavit indicated that the drainage along Duck Pond Road, that's what we have, we have Duck Pond Road, is the line of demarcation. To the north of it is the White Deer subdivision, to the south of it is Seco. Kabbas in her preliminary report and in her argument to the Neville affidavit indicates consistently that the general drainage is to the north and if you look at the maps of the elevations, you can see on the elevations that there are elevations, if you look especially at the east end of the property, the White Division subdivision, you can see that it clearly goes from an elevation where the Seco property is higher, it goes dramatically along the east boundary that goes to the north, it's like eight feet downhill and water runs downhill. And there are other parts of the property where it's not so clear. And the salient factor that I'm suggesting to the court is that, and Judge Peterson commented on this, when you get along Duck Pond Road, when you're between the two of them, it's very flat and the water, if it goes anywhere, is going to go and move very, very slowly. And the Kabbas and her affidavit makes the point that in order to determine which way the water runs, when you get down to the swale, if you will, or the line of demarcation, it's going to take field observations such as were in the plan of subdivision, which she used in her report. And the other thing that was in her affidavit was talking about the benefit analysis that was found to be irrelevant by Judge Peterson. I'm suggesting that that's really not irrelevant because there could have been an alternate method of taking the drainage away from the SECO property up north where it drains downhill. That could have been done, that was never explored. What they did was they just decided, well, we've got Duck Pond Road, we're going to make a ditch along Duck Pond Road, and we're going to have the water go into the SECO lakes. And without any cost-benefit analysis, Judge Peterson found out that that didn't make any difference. I submit that it should make a difference. In granting a summary motion for summary judgment, the judge must not attempt to weigh the evidence even where a given interpretation is more cogent. Summary judgment must be denied as long as a contrary determination is possible. I'm submitting to you that when you look at all this evidence and all this stuff that's in the common law record and in the testimony, when you look at all of that, contrary determination is definitely possible. And if it's not, if you side with the trial court judge that says, well, Mr. Callen, you're on a mission impossible because if that's what you decide that way, I'm on a mission impossible as I stand here before you today. But that's for you to judge and for you to decide. I'm suggesting that a determination that the water goes to the north is very possible, especially in light of the fact, and this is mentioned by both sides in the Groney case, which was a case decided in 1985 back in Groney County. It involved Seco properties, the same property as Seco, only a different parcel of property a little bit to the east of White Deer subdivision. And that property was the Groney farm. And Groney says, you know what? The water goes west and south, and I want to drain my farmland into the Seco property. Seco says, no, no, no. It goes north and east. And they had a battle of the experts, just like we have here. They had a full-blown trial. Judge Wilder decided that, a happy memory, he decided that the water goes east and it goes north. And in light of that, that came up to the appellate court. Gordon's here in this court. That decision was affirmed. And it indicates that there is an historic flow of the water to the north off of this Seco property. And that salient fact and the decision by this court should have been taken into consideration by Judge Peterson. Could he? Wasn't that a Rule 20? Could he? That was a Rule 23, wasn't it? It sure was. Justice Stouter was the judge that wrote that. So the trial judge is prohibited from using that, is he? Well, it involves the same parties. Well, it involves one of the same parties. I don't know if he's prohibited from using it. You know, you're prohibited from using it on appeal. And I think that that could be part of the rest justice of the case, if that's what I'm suggesting to you. But I don't think it's what I think doesn't really matter. I'm suggesting that if not, that it could be used for that purpose to determine whether it was an issue of fact, prior decision of this court and the lower court. The next area of the appeal that we're talking about is the annexed two parcels of the SECO property. The annexed two properties that were in the south section of, I believe it's Township 24. I have two minutes? Okay. What I want to say on that is that you can only annex property if it's, in a drainage case, if it's connected or it benefits. There is no benefit. I'm suggesting there is no evidence of a benefit in the nature of which I cited the Clear Creek case, which is cited in my brief, where they look to see where there was soil erosion, flooding problems, crop damage, sedimentation. No findings of that, that the property that's being served, the White Deer subdivision, would have been benefited by those. In fact, the drainage was working fine. That's part of the coppice affidavits, that the drainage was working okay, going east and west along Duck Pond Road. It wasn't necessary to go across the street under the SECO property. Finally, the elevations are, if you look at the elevations and you go over and see, they're saying that they have two strip mine ponds, and then another pond is the main lake of SECO Steel, and that's in the drainage district. But the affidavit by Mr. Neville doesn't indicate that those ponds are connected. In fact, he says it currently cannot be determined if such a connection exists. So that is all in my brief, and I ask you to take a look at that. And finally, the elevations on the west end along Dresden Road, if you go up along Dresden Road, you can see the elevation also goes uphill along Dresden Road. So there's really an issue as to whether this property drains north or south. So that's the north and the south of it. Any questions? Thank you, Mr. Callan. Mr. Schmidt. Thank you. May it please the court, counsel. Charles L. Schmidt on behalf of the Appalachee Claypool Drainage and Levee District. This appeal involves two primary issues. The first is the installation of an 18-inch culvert under Duck Pond Road by the district. The second issue is the annexation of two parcels of real estate owned by SECO into the district, and whether or not the trial court properly granted summary judgment on these two issues in favor of the district. These are independent issues. It is not necessary that the annexation take place in order for the tile to be installed, nor is it necessary for the tile to be installed for the annexation to be approved. The Claypool Drainage and Levee District is a municipal body politic. It was organized in 1896 under the predecessors to the Illinois Drainage Code. It's governed by three commissioners appointed by the Grundy County Board. Claypool is responsible for maintaining the works of the district. In order to ensure proper stormwater drainage for properties in the district, it consists of over 26,000 acres, and it's watershed in Grundy and Will Counties. The works of the district include the main Claypool drainage ditch and a number of tributaries. The other party in this case is the SECO Club. It's a private recreation club. It's located on former strip mine land. They purchased it in the 1950s after mining was discontinued, and its members used the property for recreational uses including camping, swimming, and fishing. I would like to point out in Eppley's brief at appendix page A-19, there's an aerial photograph, and I think it can be very helpful to visualize the things we're talking about. On that aerial photo, the northern boundary of the Claypool Drainage District is shown as a thick black line. The SECO property is a triangular-shaped property. It's founded at the north by Duck Pond Road, west by Dresden Road, and at the east by the BNSF Railroad. And on that aerial photo, there is a red line that shows the proposed location of the 18-inch tile. That red line does angle back and run parallel for a short distance along Duck Pond Road. What that part is indicating is cleaning out an existing ditch that has been sedimented in. The only new work that is proposed is the actual 18-inch tile going underneath Duck Pond Road. Highlighted in yellow on the aerial photo are the two SECO parcels that have been annexed into Claypool. I would point out that those two parcels are completely surrounded by other property that is already within the district. Also on this aerial photo is a blue line, and what that blue line depicts is the flow of stormwater. In the Claypool system, the pits in the SECO Club and across the street on Dresden Road in the Coastal Area Club, those strip line pits are actually part of the drainage system. They serve as detention for stormwater. That stormwater moves through there along that blue line. The only discharge point for the SECO Club for its stormwater is through that culvert underneath Dresden Road. All of their stormwater drains into the Coastal Area Club following that blue line, and from there off farther to the west, not shown on the photograph, it discharges directly into the main Claypool ditch. So all of the stormwater for SECO Club, all of the stormwater for Coastal Area Club goes into the main ditch, and it's the ditch that carries that stormwater away. We've also indicated on the aerial photo what's been referred to in the litigation as the Maquetta Tile. It's shown in black at the lower left-hand corner, the highlighted properties near the beginning of the blue line. The White Deer subdivision is a small rural subdivision. It's 13 lots on about 80 acres. Most of the lots are 5 acres or more. It's located on the north side of Duck Pond Road and extends northward to the northern boundary of the district. Back in 2009, the commissioners observed that stormwater runoff from the White Deer subdivision was draining south and collecting along the north side of Duck Pond Road. Duck Pond Road was acting more or less as a dam, preventing the further southward movement of the stormwater. And in order to improve that situation, the district filed a verified petition, pursuant to Section 4-34 of the Drainage Code, to authorize the installation of the 18-inch tile. Section 4-34 provides that the verified petition of the commissioners is presumed true and correct, and that it makes out a prima facie case for the district. After extensive discovery in this case, I believe it went on for a year and a half or more, the district filed a second motion for summary judgment, supported by the affidavit of its engineer, Mr. Greg Neville. Mr. Neville's affidavit concluded that stormwater naturally flowed from the White Deer subdivision southward to Seacoa, impeded only by Duck Pond Road. That's indicated at appendix page 815. Mr. Neville explained in his affidavit how he arrived at that conclusion. He examined historical photographs that show the accumulation of water on the north side of Duck Pond Road. And on at least two separate occasions, he personally observed the accumulation of stormwater in that location. Also, when Mr. Neville considered this very important, after this litigation commenced, we discovered an existing drain tile that had been mostly sedimented in, but there was an existing drain tile already underneath Duck Pond Road, about 600 feet west of the proposed location for the new one. Going even further to the west of that, along Duck Pond Road, is the Maquetta Tile. And that also carried water from north to south across Duck Pond Road. Corroborating Mr. Neville's conclusions were the two-foot topographical maps. Mr. Neville noted in his affidavit that there was a drainage divide located about 900 feet north of Duck Pond Road. This is at appendix page 13. And he observed that the observations of that ridge were between 550 and 604 feet. And then as he moved southward from that ridge, he found lower elevations. And he noted that the elevation just to the north of Duck Pond Road was 548 feet. Moving even further to the south, going into the Seco Club, Mr. Neville observed that the water surface elevation of all of the ponds in the Seco property were at 542 feet. So as we move from this divide, going southward across Duck Pond Road, we have a fall of between 6 and 12 feet. The Seco Club filed a brief in opposition to summary judgment, and they attached the affidavit of Karen Cabas. Judge Peterson found, however, that the affidavit consisted largely of questions and speculation without reaching a definitive opinion. I'd like to talk about just a couple of the paragraphs. I don't want to go into all of them, but paragraph 15.15, I believe, is the closest that Ms. Cabas' affidavit comes to actually reaching any sort of conclusion. This paragraph was not stricken by the trial court, but she says in that paragraph, my conclusion is that water may flow north to the White Deer Subdivision Quarry Pond before it would flow into the Seco Lakes, even with the cross culvert under Duck Pond Road cleaned out. The culvert she's talking about here is the existing one, 600 feet to the west. But ultimately, this paragraph doesn't contain any definitive conclusion that stormwater doesn't flow from north to south. She says it may. She even suggests when we clean out that existing culvert, that water will flow more readily from north to south. So she's almost corroborating what our engineer is saying. Another paragraph I'd point to is 15.5. This one was stricken pursuant to Rule 219C. Ms. Cabas says that stormwater may have historically flowed north to the White Deer Subdivision Pit if the wetlands had filled up and spilled over at elevation 548.7. We've already established, however, that the Seco Pits are at 542 feet. So even if we accept this paragraph, that water may flow to the north, it doesn't do so until the pits are six feet above where they're already at. It would take literally a storm of biblical proportions to fill up that depression and reverse the flow of the water, even with her own conclusions. Ms. Cabas also points to isolated clusters of elevations off in the corners of the White Deer Subdivision that may have lower elevations than other points within the Seco Club. And Mr. Callum mentioned this a little bit, especially to the east. And I would suggest that there may well be a pocket way off in the far corner of the subdivision that doesn't necessarily flow to the north. But what I would say to this Court is that even after this tile is installed, that isolated pocket will continue to do so. It'll still go whatever direction it's going. There is no proposal in the pleadings and nothing in the summary judgment that would alter the contours of the land. The only work that is proposed is the new 18-inch tile. So if there's a far corner that happens to go that way, it'll still do so. We're not drawing any more water to that tile than is already going there. With respect to Mr. Neville's conclusion that stormwater flows from north to south, Judge Peterson made the comment, Ms. Cabas just won't directly contradict it. She didn't. It's not in there. What's uncontradicted is that there's already a culvert 600 feet to the west. There's already another culvert and a cut culvert. And I would suggest that the trial court properly concluded that the Seco Club failed to raise any genuine issue of material fact on this issue. I want to move on to the petition to annex. Again, this is a separate issue. Annexation is governed by Section 8-3 of the Drainage Code. And there are two separate bases on which property can be annexed into a district. And that is if the land is connected to a district drain or if the land is benefited from or protected by any district work. And when the statute says connected, it says connected to a drain. It doesn't mean it has to be adjacent or abutting to other land. It means does the water go into the works of the district, into a district drain? The petition to annex was verified by the commissioners. It was supported by the opinion of the district engineer. And he concluded that both of those bases were present in this instance. He believed the annexed parcels were both connected to and benefited from the work of the district. The parcels are completely surrounded by other land already in the district. And both engineers agreed, this is uncontradicted, both engineers agreed that the only outlet for Seco's stormwater, including the two annexed parcels, is the Dresden Road culvert. It all moves through that culvert. If that culvert wasn't there, if the outlet wasn't there for the stormwater to move from the Seco Club into the drainage ditch, ultimately, there would be no outlet for stormwater, no way for them to control the level of their pits, and no way to discharge water, they would experience flooding. Judge Peterson noted that it was uncontradicted. He made the finding, the evidence is established by the affidavit, and it is uncontradicted, that the water from the Seco Club flows to the Colcidieri Club. It drains west and south to the Colcidieri Club through the Dresden Road culvert. The secondary issues in this case are the orders of the trial judge striking certain paragraphs of the CABIS affidavit. Back on June 9, 2011, the trial court entered an order that required that all expert witnesses and their opinions be disclosed within 30 days, all rebuttal opinions disclosed within 30 days after. This was after a year and a half of discovery. Claypool timely made its disclosure, and on the last day for filing dispositive motions, Claypool filed its second motion for summary judgment with Mr. Neville's affidavit attached. Seco thereafter filed its response with Ms. CABIS' affidavit, and Claypool filed a motion to strike the affidavit. We believe that certain of the paragraphs were not in compliance with Supreme Court Rule 191A, and that other paragraphs contained facts and opinions that were not previously disclosed, and we ask that they be stricken pursuant to 219C. In fact, the Claypool motion asked the court to strike the paragraph, the affidavit in its entirety, is what we asked for initially. Judge Peterson declined to do that. He didn't want to strike the entire affidavit. But what he did do is he took the two affidavits and he compared them side-by-side, paragraph-by-paragraph, and he did conclude that some of the statements therein were not in compliance with Supreme Court Rule 191, that they were speculative or conclusional or contained irrelevant evidence, and that others were not previously disclosed. So he did strike certain of those paragraphs for various reasons. I would suggest to this court that Judge Peterson's approach to this, looking at it paragraph-by-paragraph, side-by-side, was a very measured and limited and proportionate response and a discovery sanction that was well within his discretion. Judge Peterson also made the comment in ruling on this motion. He said, even if no paragraphs of Karen Kavis' affidavit were stricken, even if I left in every word, there is still no material issue of fact in this case. And I think that statement dovetails with the purpose of Supreme Court Rule 191. He's saying, well, it's not relevant. It's not supported. So it doesn't generate a material issue of fact. One case I would like to point to is Sacramento Crushing Corporation, First District, 2000 case, involved very similar issues. And the court there said that the mere suggestion that an issue of fact exists is insufficient to create one. And I think that's exactly what's going on here. We have the district engineer who makes definite conclusions. He says the water flows north to south. And we have another engineer that says, well, maybe it does. Maybe under these circumstances it might, may, it could. She never comes straight out and contradicts that conclusion. She just suggests. For those reasons, I would ask the court to affirm Judge Peterson's summary judgment in favor of the district. Thank you. Mr. Callins, rebuttal. Thank you. The tiles that he's talking about, the crossover from Duck Pond Road, the evidence indicates or the reasonable inference that they are equalizing tiles, that the water will go both ways because that land is very flat there. They equalize it depending where the rain falls, number one. Number two, I look at that exhibit that they say Mr. Schmitz put in his brief. And I would suggest that you also take a look at it because I believe, I'm suggesting to you, it supports my position that if you see the two highlighted yellow parcels on there, those are the parcels that are going to be annexed. The other parcels south of that are already in the district. And this blue line shows one of the lakes that's in the district, crosses over Dresden Road on the west side and goes into the Cole City Area Club, which eventually goes into the Claypool Ditch. If you look at that, it doesn't appear that the parcels to be annexed are connected to that lake that goes into Cole City. And in paragraph 24 of Mr. Neville's deposition, it's in the common law record 2481, it says whether these connections currently exist is unknown to Claypool, but the right to annex absolutely exists. And he's talking about whether these strip-by lakes in the yellow part are connected to the main lake that goes into the Cole City, that goes into the ditch. So he's not clear in his affidavit, I suggest to the court, if you look at this over, that there is a connection. That's the first point. The second one is I will also reinstate my argument that it doesn't appear that there's a benefit to these parcels of property for SECO to be benefited by them. For the reasons I cited in the Clear Creek case. Also, it is, this whole thing started out when the people at White Deer Subdivision, about 12 homeowners, voluntarily annexed into the Claypool District and then wanted to drain. The evidence, or the evidence of the affidavit shows that Ms. Kampus went out there, looked at the drainings that was being done on the north side of Duck Pond Road, and indicated that it was functioning properly. And why would it be necessary if that is the case? That is an issue of fact, in addition to which way the water flows. Now, I'm sure there's one thing. Sure. From just a practical standpoint, if in fact the water, I can understand why if you're downstream of something, you don't want somebody dumping all this water along with the sediment that it contains. But if the water is actually flowing from south to north, what do you care about the culvert? Well, I'm just saying that I'm saying it's an equalizing culvert because we can't determine from those culverts that in fact run south. It could just as easily run north because the level of the land is so low at that particular point. And the, if I can just go on a little bit, it's clear both sides agree that on the east end of this White Deer property, it definitely goes downhill to the north. That could have been where their drainage should have gone. They should have ran along Duck Pond Road to the east to go north, downhill, and they wouldn't have had to bother with SECO. So I submit that's clear from the evidence. And that's how this whole thing started with the voluntary annexation. And then where do we go for drains? They do have a retention pond in White Deer subdivision, and that's what I suggest Miss Cobbess was talking about when she said the retention pond is going to just swale along this ditch along the north side of Duck Pond Road that they constructed, that they wanted to construct. That's in the photograph. So I'm suggesting that water runs north. And paragraph 27, just briefly, let me leave you with this. Paragraph 27 of Cobbess' affidavit was not stricken. It says, when using the cluster of spot elevations in the computerized Grundy County GIS, and that's what both experts used, it shows that to draw the map, the cluster of spot elevations support my field observations. She made field observations on June 19, 2011, and accepted by the district engineer which the current drainage system doesn't appear to drain into the SECO ponds. In other words, it doesn't drain north. That's part of her affidavit. I'm suggesting that creates an initial effect on this case. Do I have any questions now? No? Okay. Thank you very much. Thank you, Mr. Callan. Thank you both for your arguments here this afternoon. This matter will be taken under advisement, written disposition will be issued, and right now the court will be in a brief recess for a panel change before the next case.